

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-20-00031-CV

_____

ROY UPSHAW AND R&S UPSHAW FRANCHISING, LLC, Appellants

V.

LACADO, LLC; ANDREW K. WILSON; CADE WILSON; AND CARRD, LLC,
Appellees

---

On Appeal from the 96th District Court
Tarrant County, Texas
Trial Court No. 096-293316-17

---

Before Birdwell, Wallach, and Walker, JJ.
Opinion by Justice Walker

# OPINION

Appellants Roy Upshaw and his limited-liability company, R&S Upshaw Franchising, LLC, appeal from a jury verdict, finding that Upshaw had breached three franchise agreements he had entered into with appellees Lacado, LLC and Andrew K. Wilson and had committed fraud. Upshaw and R&S argue that the evidence did not support the jury's adverse findings against Upshaw. They also attack the trial court's attorney's-fee award. Because we conclude that the evidence supported the jury's breach-of-contract findings and because there was no reversible charge error, we affirm the trial court's actual-damages award. But because the trial court erred by rendering an attorney's-fee award after the jury found Lacado was entitled to no attorney's fees, we reverse that award and remand for a new trial on the issue.

## I. BACKGROUND

### A. FACTS

#### 1. Upshaw Founds Restaurant Chain

In 1972, Upshaw opened a fast-food restaurant after giving up a Taco Bell franchise. Upshaw used the same recipes as Taco Bell for his new restaurant, Taco Hut. Over time, Upshaw opened additional restaurants and renamed them Taco Casa. In 1984, Upshaw began franchising Taco Casa restaurants. In the mid-1980s, Upshaw tried to obtain the federally registered trademark for Taco Casa but was unsuccessful because someone else owned the mark.

2

## 2. The Franchise Agreements

In 2010, Wilson, the owner of Lacado, became interested in buying a Taco Casa franchise and met with Upshaw. Upshaw assured Wilson that he owned the Taco Casa trademark and that he did not receive rebates from Taco Casa vendors.[1] Upshaw's contract with one of those vendors—Coca-Cola—required him to give "written notification" to his franchisees that he was receiving rebates from Coca-Cola and the purpose for which those funds were to be used. The purpose of the rebates

---

[1]Lacado's counsel explained to the jury that vendors paid rebates to franchisors based on the amount of product the franchisees bought from the vendors, which could increase the price of the product for the franchisees:

> [W]e claim that Mr. Upshaw failed to disclose that he was getting kickbacks or rebates on products that Lacado purchased as the . . . franchisee. In other words, . . . when Lacado would buy Coke, for example, Mr. Upshaw, the franchisor, would get a kickback or a rebate on the Coke purchases.
>
> . . . .
>
> The evidence is going to be that the franchisee, each of the locations, they have to buy food and beverage from suppliers to operate the restaurant.
>
> Well, a kickback or a rebate would be money that that supplier then gives not to Mr. Wilson or Lacado, for example, but would go back to Mr. Upshaw.
>
> So it's important to know that, because if there are kickbacks or rebates involved, that has the effect of increasing the cost of the food or the beverage, the ingredients that go in.

Upshaw disputed that the rebates increased prices for franchisees.

3

were, by contract, to be used for the "benefit" of the franchisees, which Upshaw understood to mean that he was to use the rebates "for advertising for the franchisees." Upshaw offered Wilson a franchise in Mansfield and gave Wilson the required Federal Disclosure Document (FDD) on April 29, 2011. *See* 16 C.F.R. § 436.2. Wilson signed it, acknowledging that he had received a copy of the FDD and that he understood he had a responsibility to review the FDD before signing a franchise agreement.

On December 27, 2011, Wilson (on behalf of Lacado) and Upshaw (as Taco Casa's president) signed a 20-year franchise agreement for the Mansfield location. Lacado was listed as the "owner" of the franchise. In exchange for a $35,000 franchise fee and a 6% gross-sales royalty, the franchise agreement granted Lacado a "limited license to use the [Taco Casa] trademarks." Lacado acknowledged that Taco Casa had "the sole and exclusive right" to use the trademark and agreed that it would not contest Taco Casa's ownership or use of the trademark.

Taco Casa contractually required its franchisees to complete a 90-hour training program covering "construction requirements, equipment, site selection, advertising, promotions, accounting and bookkeeping procedures, communications, operations management, personnel management and problem solving." Taco Casa was also obligated to "develop and administer advertising and sales promotion programs designed to promote and enhance the collective success of all Taco Casa restaurants." The franchise agreement contained a disclaimer-of-reliance paragraph:

4

This agreement and the documents referred to herein constitute the entire agreement between the parties and supersedes and cancels any and all prior and contemporaneous agreements, understandings, representations, inducements and statements, oral or written, of the parties . . . . The franchisee expressly acknowledges that it has entered into this franchise agreement as a result of its own independent investigation . . . and not as a result of any representations of [Taco Casa] . . . .

Lacado and Wilson entered into a second 20-year franchise agreement with Taco Casa on October 15, 2013, for a location on Little Road in Arlington. Lacado and Wilson were listed as the owners of the franchise, and Wilson signed as the owner and franchisee. Upshaw signed the agreement as Taco Casa's president. The operative terms of the second franchise agreement were the same as the first.

On October 22, 2014, Lacado entered into a third franchise agreement with Taco Casa for a location on Collins Street in Arlington.[2] As before, Wilson signed the agreement as the franchisee, and Upshaw signed as Taco Casa's president. The relevant terms of the third franchise agreement were the same as in the first and second franchise agreements.

Lacado's franchises were successful. Between 2012 and 2019, Lacado paid Upshaw $1,855,430.78 in royalties. During that same time period, Lacado's combined gross sales were $33 million.

---

[2]The 20-year term in the third franchise agreement was crossed out.

### 3. Wilson's Discovery

In February 2016, Wilson discovered that another Taco Casa franchisee in Texas had filed a fraud suit against Upshaw, alleging that Upshaw did not own the Taco Casa trademark.[3] That suit also alerted Wilson to the fact that Upshaw was receiving undisclosed rebates from Taco Casa's approved vendors.

Wilson and his son, appellee Cade Wilson, investigated and found that a woman in Topeka, Kansas, owned the Taco Casa mark. Taco Casa's FDD to Lacado had disclosed neither that Upshaw did not own the Taco Casa mark nor that Upshaw received rebates from vendors, both of which are required to be disclosed in an FDD. *See* 16 C.F.R. § 436.5(h)(8), (m). In fact, when Upshaw was asked what trademarks he owned when he had provided the FDD to Wilson, Upshaw responded, "I didn't own any." Similarly, Upshaw admitted that he did not have the Taco Casa trademark to license when he entered into the franchise agreements with Wilson and Lacado. Upshaw also admitted that at the time he provided the FDD to Lacado, he had been receiving rebates from vendors when his franchisees would buy the vendors' products. Wilson later stated that had he known that Upshaw was being "dishonest" and "was receiving these rebates," he would have never entered into the franchise agreements.

---

[3]Apparently, this suit spurred Upshaw to file another unsuccessful application for the federally registered trademark in December 2015.

In June 2016, R&S, as the franchisor, began disclosing in its FDD to prospective franchisees that it did not own the Taco Casa registered trademark[4] and that it received rebates from Taco Casa's approved vendors. Upshaw then attempted to buy the mark from its owner's bankruptcy estate in Kansas and initially bid $5,500. Cade also attempted to buy the mark for $25,000, which caused Upshaw to increase his bid to $27,000. Upshaw eventually bought the Taco Casa mark and other bankruptcy-estate assets in 2017 for $375,000.

## B. PROCEDURE

### 1. Lacado Files Suit

On July 9, 2017, Lacado filed suit against Upshaw, his wife Shelda Upshaw,[5] and R&S, raising a claim for breach of the franchise agreements based on his failure to own the Taco Casa trademark, to provide training to Lacado's employees, and to develop and administer advertising and sales-promotion programs.[6] Lacado also alleged fraud based on Upshaw's failure to disclose the vendor rebates and based on Upshaw's false assertions that he owned the trademark and that he would provide Lacado with recipes, operations manuals, and suppliers' and vendors' names. Lacado

---

[4]R&S stated that it had used the Taco Casa name since 1972 and that it had filed a trademark application with the Patent and Trademark Office in 2015.

[5]Shelda died while the case was pending in the trial court. *See* Tex. R. Civ. P. 155.

[6]Lacado raised the breach-of-contract claim against R&S as well "[t]o the extent that Upshaw has assigned the Franchise Agreements to R&S."

7

asserted that Upshaw's concealment of the fact that he did not own the trademark and that he was receiving rebates justified the application of the discovery rule, tolling the applicable statute of limitations. Finally, Lacado pleaded for the recovery of its attorney's fees. *See* Tex. Civ. Prac. & Rem. Code Ann. § 38.001.

Upshaw and R&S answered Lacado's claims and raised several affirmative defenses, including limitations and waiver. *See* Tex. R. Civ. P. 94.

### 2. Upshaw Counterclaims and Files a Third-Party Petition

Upshaw counterclaimed for Lacado's alleged breaches of the franchise agreements. *See* Tex. R. Civ. P. 97. He alleged that Lacado had interfered with his attempts to buy the mark from the bankruptcy estate, raising the price he eventually had to pay. Upshaw also alleged that Lacado "failed to perform duties under the franchise agreements, including but not limited to menu offerings, marketing plans, and protection of trade secrets." Finally, Upshaw counterclaimed for Lacado's alleged fraud based on Lacado's warranting in the franchise agreements that it had obtained counsel to review them.

Lacado answered the counterclaims and raised several affirmative defenses, including justification and fraudulent inducement.

Upshaw also raised third-party claims against Wilson, Cade, and Cade's limited-liability company, appellee Carrd, LLC. *See* Tex. R. Civ. P. 38(a). Upshaw's first claim alleged that Wilson, Cade, and Carrd tortiously interfered with Upshaw's franchise agreements with Lacado by "attempting to make a straw purchase for Lacado of the

8

Taco Casa trademark" from the bankruptcy estate. The second claim alleged that Lacado, Wilson, Cade, and Carrd engaged in a conspiracy to interfere with Upshaw's purchase of the Taco Casa trademark. Wilson, Cade, and Carrd answered the third-party claim and raised affirmative defenses, including justification.[7] Upshaw pleaded for the recovery of his attorney's fees.[8]

After a flurry of summary-judgment cross-motions and responses touching on all claims and some affirmative defenses, the trial court granted summary judgment in favor of Lacado regarding Upshaw's fraud counterclaim.[9] The other claims proceeded to a jury trial, based on Lacado's request for a jury and payment of the jury fee. *See* Tex. R. Civ. P. 216.

### 3. Trial and Post-Trial

After a two-week jury trial, the jury made the following findings regarding Lacado's breach-of-contract claim:

- Upshaw had breached the franchise agreements.

- Lacado should have discovered the breach of the first franchise agreement by October 15, 2013.

---

[7]As to Lacado, Upshaw's conspiracy claim was a counterclaim.

[8]As to Lacado, Upshaw asserted that the franchise agreements prohibited an attorney's-fees award; thus, he pleaded for attorney's fees against Lacado in the alternative to his contractual-bar argument.

[9]The trial court indicated in the order that the fraud counterclaim had been brought by Upshaw and R&S; however, only Upshaw raised the counterclaim against Lacado.

9

● Lacado did not waive its claim.

● Lacado's damages attributable to Upshaw's breach of the franchise agreements were, collectively, $927,716.

● Lacado was entitled to no fees for the necessary services of its attorneys.

The jury also found that Upshaw committed fraud against Lacado, causing it $139,650 in damages.

Regarding Upshaw's breach-of-contract counterclaim, the jury found that although Lacado had failed to comply with the franchise agreements, Lacado had been fraudulently induced to enter into them. As to Upshaw's third-party, tortious-interference claim, the jury found that although Cade and Carrd had intentionally interfered with the franchise agreements, both had had a good-faith belief that they had the legal right to make an offer to buy the Taco Casa trademark. And regarding Upshaw's conspiracy claim, the jury found that Lacado, Wilson, Cade, and Carrd had been part of a conspiracy that damaged Upshaw but that Cade and Carrd had not acted with malice.[10] As it had for Lacado, the jury determined that Upshaw was entitled to no attorney's fees.

Lacado, Wilson, Cade, and Carrd moved for entry of final judgment on the jury's verdict and elected to recover for Upshaw's breaches of contract. However,

---

[10]The jury did not answer whether Lacado and Wilson had acted with malice because they had not unanimously found that Lacado and Wilson had been part of the conspiracy.

10

Lacado asked the trial court to disregard the jury's finding that it was not entitled to attorney's fees based on Lacado's evidence, which Lacado asserted conclusively established the amount and the reasonableness of its necessary attorney's fees. *See* Tex. R. Civ. P. 301.

Upshaw and R&S filed a motion for entry of judgment on the jury's findings that Lacado had breached the franchise agreements, asked the trial court to disregard the findings in favor of Lacado, and asked the trial court to disregard the jury zero finding regarding Upshaw's attorney's fees.

The trial court entered judgment against Upshaw and in favor of Lacado for Upshaw's breaches of the franchise agreements and awarded Lacado a total of $927,716 in actual damages as found by the jury. The trial court disregarded the jury's zero award for attorney's fees and awarded Lacado $448,446.56 in reasonable and necessary attorney's fees relating to Upshaw's breaches and included additional amounts for appellate attorney's fees. The trial court charged prejudgment and postjudgment interest against Upshaw and charged costs against him.[11] Finally the trial court noted that Upshaw's breach-of-contract and tortious-interference claims failed because Lacado, Cade, and Carrd had prevailed on their affirmative defenses to those claims. The trial court included finality language in the judgment: "All other

---

[11]The trial court clerk's bill of costs reflected $20,352.63 in fees, $4,429 of which had been paid by Upshaw and R&S.

11

relief not expressly granted herein is denied. This judgment finally disposes of all parties and all claims and is appealable as a final judgment."

Upshaw and R&S filed a motion to modify, reform, or correct the final judgment and an alternative motion for new trial, raising the same arguments asserted in their prejudgment motion for entry of judgment. The trial court denied the motion.

Upshaw and R&S appealed from the trial court's judgment and now argue that the breach-of-contract recovery in Lacado's favor must be reversed because Lacado waived its right to a jury trial in the FDD, Lacado waived its claims by continuing to operate under the franchise agreements, Lacado's claim is time-barred, Lacado cannot enforce the agreements while also asserting they were fraudulently induced, Upshaw did not breach the agreements as a matter of law, Lacado suffered no damages as a matter of law, the judgment amount exceeded a damages-cap provision in the FDD, and the contractual-liability questions were improperly submitted in the charge. Upshaw and R&S also attack the trial court's award of attorney's fees in Lacado's favor. Finally, Upshaw and R&S attack the jury's fraud findings.[12] Because the trial court entered judgment solely against Upshaw, imposing no liability against R&S, we will only address these complaints as having been raised solely by Upshaw.

---

[12]In the issues-presented portion of his brief, Upshaw raises eight issues, two of which contain multiple sub-issues. We will address all issues necessary for a final disposition and will attempt to identify the issue addressed by number and, if applicable, by sub-letter.

12

## II. CONTRACTUAL LIMITATIONS ON RECOVERY

### A. JURY WAIVER

Upshaw argues that Lacado waived its right to a jury trial on its breach-of-contract claim because Upshaw's FDD included an express jury waiver: "[T]he parties also agree to waive their respective rights to trial by jury, except where prohibited by federal or state law." However, Upshaw never objected to Lacado's request for a jury trial or otherwise raised the alleged contractual bar until he moved the trial court to disregard the jury's verdict. This is too late to preserve the argument that Lacado contractually waived its right to a jury trial. *See* Tex. R. App. P. 33.1(a); *cf. Wethy v. Fed. Nat'l Mortg. Ass'n*, No. 02-17-00329-CV, 2019 WL 2223577, at *3 (Tex. App.—Fort Worth May 23, 2019, no pet.) (mem. op.) ("To preserve his complaint that he was denied his perfected right to a trial by jury, Wethy was required to either object on the record to the county court's [conducting a bench trial] or indicate affirmatively in the record that he intended to stand on his perfected right to a jury trial."); *In re Marriage of Harrison*, 557 S.W.3d 99, 135 (Tex. App.—Houston [14th Dist.] 2018, pet. denied) (op. on reh'g) (delineating ways in which constitutional right to jury trial may be waived, including failing to object to bench trial even though jury requested); *Laven v. THBN, LLC*, No. 14-13-00440-CV, 2014 WL 6998098, at *2–3 (Tex. App.—Houston [14th Dist.] Dec. 11, 2014, no pet.) (mem. op.) (holding argument that contractual jury waiver was unenforceable was not preserved because it was not raised

13

in the trial court after trial court ruled jury waiver would be enforced). We overrule Upshaw's issue 1.d.

## B. DAMAGES CAP

Upshaw contends that the amount of damages allowed by the trial court exceeded the $50,000 actual-damages cap included in the FDD. In almost 150 pages of briefing, the parties collectively spend approximately 2 pages on this issue. We agree that Upshaw's argument may be quickly dispatched. The FDD was not a contract between Upshaw and Lacado. Wilson signed the FDD but only to acknowledge receipt and to affirm that he was responsible for reviewing the FDD before signing a separate franchise agreement. Wilson never indicated by signature or conduct that he consented to the terms of Upshaw's FDD, which is a condition precedent to the formation of a contract.[13] *See Phillips v. Carlton Energy Grp., LLC*, 475 S.W.3d 265, 277 (Tex. 2015) (citing *Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 635 (Tex. 2007) (per curiam)); *McCoy v. Alden Indus., Inc.*, 469 S.W.3d 716, 728 (Tex. App.—Fort Worth 2015, no pet.). *See generally* 16 C.F.R. § 436.2 (describing disclosure of FDD as obligation of franchisor, with no corresponding obligation by franchisee, subject to enforcement by the Federal Trade Commission).

---

[13]Interestingly, when R&S began providing the updated FDD to prospective franchisees in 2016, it included a cover page expressly stating that "[t]he terms of your contract will govern your franchise relationship. Don't rely on this [FDD] alone to understand your contract."

14

Additionally, the franchise agreements did not incorporate Upshaw's FDD or otherwise include a damages limitation. In fact, the franchise agreements provided that they were "the entire agreement[s] between the parties"; thus, even if Upshaw's FDD were considered a contract between Upshaw and Lacado, it was superseded by the franchise agreements. We overrule Upshaw's issue 1.c.

## C. ATTORNEY'S FEES

In part of issue 4, Upshaw contends that Lacado's right to recover attorney's fees is contractually limited. Upshaw does not specifically identify which contractual provision limits Lacado's attorney's-fee recovery, but the portion of the FDD discussing dispute resolution states that "each party shall be responsible for its own costs including attorney's fees in any court, mediation or arbitration proceedings, except as otherwise provided in the franchise agreement." Again, the FDD was not a contract between Lacado and Upshaw, and the franchise agreements specifically stated that they were the operative agreements between the parties. We overrule this portion of issue 4.

## III. BREACH OF THE FRANCHISE AGREEMENTS[14]

### A. STANDARDS OF REVIEW

Upshaw's substantive briefing of his sufficiency issues directed to Lacado's breach-of-contract claim are cast only in terms of the lack of any evidence to support the jury's answers to the operative questions—there was no, or legally insufficient, evidence to support Lacado's breach-of-contract recovery. We may sustain a legal-sufficiency challenge only when the record bears no evidence of a vital fact, the rules of law or of evidence bar the court from giving weight to the only evidence offered to prove a vital fact, the evidence offered to prove a vital fact is no more than a mere scintilla, or the evidence conclusively establishes the opposite of a vital fact. *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017). In making this determination, we consider evidence favorable to the finding if a reasonable fact-finder could, and disregard contrary evidence unless a reasonable fact-finder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007). But no matter what evidence is or is not considered, our ultimate test is "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005).

---

[14]In the franchise agreements, Taco Casa was the franchisor and Lacado was the franchisee. The jury charge, however, asked whether "Upshaw" or "Lacado" had breached the franchise agreements. The parties also use Upshaw and Lacado in their briefing. We will use the charge's and the parties' nomenclature, referring to the franchisor as Upshaw and to the franchisee as Lacado.

16

When a party attacks the legal sufficiency of an adverse finding on an issue on which the party had the burden of proof, the party must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam). In reviewing such a challenge, we examine the record for evidence that supports the finding, while ignoring all evidence to the contrary. *Id.* If no evidence supports the finding, then we examine the entire record to determine if the contrary position is established as a matter of law. *Id.* We will sustain the issue only if the contrary position is conclusively established—when the evidence leaves "no room for ordinary minds to differ as to the conclusion to be drawn from it." *Int'l Bus. Mach. Corp. v. Lufkin Indus., LLC*, 573 S.W.3d 224, 235 (Tex. 2019).

## B. LIMITATIONS

Upshaw argues that because Lacado's breach-of-contract claim accrued either when the first franchise agreement was signed in December 2011 or "near the time the first [franchise] store opened" in 2012, Lacado's July 2017 claim is time-barred based on the applicable four-year statute of limitations. *See* Tex. Civ. Prac. & Rem. Code Ann. § 16.051. Therefore, Upshaw asserts that no evidence supported the jury's finding that Lacado should have discovered Upshaw's breaches of the first franchise agreement by October 15, 2013, which was the date Wilson signed the second franchise agreement. In other words, Upshaw attacks the sufficiency of the evidence

17

to support the jury's answer regarding the discovery rule, which was Lacado's pleaded affirmative defense to Upshaw's defense of limitations.

Lacado argues that because Upshaw did not request a jury question on the statute of limitations or on the date the first agreement was breached, he waived his limitations argument. *See, e.g.*, Tex. R. Civ. P. 278–79; *In re Est. of Lopez*, No. 10-18-00278-CV, 2021 WL 2252138, at *10 (Tex. App.—Waco May 21, 2021, no pet. h.) (mem. op.); *Mytel Int'l Inc. v. Turbo Refrigerating Co.*, 689 S.W.2d 315, 318 (Tex. App.—Fort Worth 1985, no writ). This contention is belied by the record. Upshaw requested five jury questions regarding when Lacado's breach-of-contract claim accrued: "By what date should Lacado, in the exercise of reasonable diligence, have discovered" each of Upshaw's specified breaches.[15] The trial court denied each request. As we have noted, the charge included a question regarding when Lacado should have discovered Upshaw's breaches of the first agreement, and Upshaw now challenges the jury's answer to that question. By raising this issue in his motion to disregard the jury's findings and in his motion for new trial, Upshaw preserved his argument directed to the legal sufficiency of the evidence to support the jury's accrual

---

[15]We recognize that these requested questions were directed to Lacado's assertion of the discovery rule—an exception to the statute of limitations and Lacado's affirmative defense to Upshaw's limitations defense. *See Comput. Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1996). But Upshaw's requests, which effectively asked the jury to determine the accrual date of Lacado's claim for breach of contract, asked the trial court to put the entire limitations issue in the hands of the jury.

finding. *See Cecil v. Smith*, 804 S.W.2d 509, 510–11 (Tex. 1991); *J. Michael Ferguson, P.C. v. Ghrist Law Firm, PLLC*, No. 02-18-00332-CV, 2021 WL 2006321, at \*10 (Tex. App.—Fort Worth May 20, 2021, pet. filed) (mem. op.); *United Parcel Serv., Inc. v. Cengis Tasdemiroglu*, 25 S.W.3d 914, 916 (Tex. App.—Houston [14th Dist.] 2000, pet. denied).

Lacado had the burden to prove and secure favorable findings on its discovery-rule affirmative defense. *See Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515, 518 (Tex. 1988). Accordingly, Upshaw must show that no evidence supported the jury's finding. *See Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 215 (Tex. 2011) (op. on second reh'g). He has not done so.

The evidence at trial showed that Upshaw did not provide an FDD to Lacado as part of the execution of the second and third franchise agreements. Wilson did not ask Upshaw for an FDD before he signed the second and third franchise agreements. The jury could have reasonably found that because Lacado's breach-of-contract claim regarding the first franchise agreement was at least partially based on Upshaw's failures to disclose the required information in the FDD, which Wilson testified induced him into entering into the first franchise agreement, Lacado should not be charged with discovering Upshaw's breaches until the date he signed the second franchise agreement with no FDD. Thus, the jury could have reasonably found that the failure to ask for an FDD before signing the second or third agreements triggered Lacado's duty of reasonable diligence. *See, e.g., LaTouche v. Perry Homes, LLC*, 606 S.W.3d 878, 886–87 (Tex. App.—Houston [14th Dist.] 2020, pet. denied).

19

Further, Wilson testified that before he signed the first franchise agreement, he affirmatively asked Upshaw about the trademark and any rebates. Upshaw assured Wilson that he had the trademark "handled" and Upshaw denied receiving any rebates. This evidence also supports the jury's finding that Wilson could not have discovered a breach of the first agreement until he signed the second agreement without an FDD. *See S.V. v. R.V.*, 933 S.W.2d 1, 6–7 (Tex. 1996) (discussing discovery rule and noting that "when the wrong and injury were unknown to the plaintiff because of their very nature and not because of any fault of the plaintiff, accrual of the cause of action was delayed").

Upshaw asserts that the discovery rule's tolling of limitations cannot apply here as a matter of law because Lacado's claim was "clearly not 'inherently undiscoverable.'" *See generally Carl M. Archer Tr. No. Three v. Tregellas*, 566 S.W.3d 281, 290 (Tex. 2018) (holding discovery rule tolls limitations accrual if injury inherently undiscoverable). But Upshaw provided Lacado with an FDD that did not disclose as required that Upshaw did not own the trademark and was receiving rebates, which comported with Upshaw's verbal assertions to Wilson. And the first franchise agreement affirmatively represented that Upshaw owned the trademark. To require Lacado to independently check the veracity and completeness of the FDD or to independently verify each representation in the franchise agreement distorts the discovery rule's reasonable-diligence requirement. *Cf. id.* at 291–92 ("[O]ne who 'already owns the land . . . is not required to search the records every morning in order

20

to ascertain if something has happened that affects his interests or deprives him of his title.'" (quoting *Cox v. Clay*, 237 S.W.2d 798, 804 (Tex. App.—Amarillo 1950, writ ref'd n.r.e.))). In short, more than a mere scintilla of the evidence established that Lacado could not have discovered the breach of the first franchise agreement until October 15, 2013, which was within the limitations period.[16] *See, e.g.*, *Design Tech Homes, Ltd. v. Maywald*, No. 09-11-00589-CV, 2013 WL 2732068, at *5 (Tex. App.—Beaumont June 13, 2013, pet. denied) (mem. op.). *See generally Carl M. Archer*, 566 S.W.3d at 290–91 (discussing when injury is inherently undiscoverable).

We also reject Upshaw's argument that Lacado knew about the breaches of the second and third franchise agreements when it entered into the first franchise agreement on December 27, 2011. Any breach of the second and third franchise agreement necessarily could not have occurred before those agreements were executed. We overrule Upshaw's issue 1.e.

## C. WAIVER

Upshaw asserts that Lacado waived its breach-of-contract claim because it continued to operate under the franchise agreements after learning that Upshaw did not own the trademark and had been receiving vendor rebates. Upshaw recognizes that the jury found otherwise, but asserts in a superficial, passing manner with no

---

[16]Lacado cogently refutes Upshaw's argument that Lacado could have discovered the trademark and rebate breaches through public-record searches. We agree with Lacado and need not repeat those assertions here.

21

supporting caselaw that "the record clearly supports the conclusion, contrary to the jury's answer . . ., that Lacado, by its own affirmative acts and conduct, waived as a matter of law [Upshaw]'s compliance with the Franchise Agreement." We will be just as brief.

Upshaw pleaded waiver as an affirmative defense to Lacado's breach-of-contract claim; thus, he must now show that the evidence conclusively established each element of waiver, contrary to the jury's finding. *See Dow Chem.*, 46 S.W.3d at 241; *see also* Tex. R. Civ. P. 94. Accordingly, Upshaw had to establish that (1) Lacado held an existing right, benefit, or advantage; (2) Lacado had actual knowledge of its existence; and (3) Lacado actually intended to relinquish that right or intentionally acted inconsistent with that right.[17] *See Zarate v. Rodriguez*, 542 S.W.3d 26, 40–41 (Tex. App.—Houston [14th Dist.] 2017, pet. denied).

At trial, Wilson testified that he did not actually learn that Upshaw did not own the trademark and was receiving rebates until February 2016 when he heard about the other franchisee's suit, which raised those allegations. Lacado filed suit 17 months later. *See generally* Tex. R. Civ. P. 13 (requiring "reasonable inquiry" by counsel before filing suit). The evidence did not conclusively establish, contrary to the jury's finding, that Lacado waived its breach-of-contract claim once it discovered that Upshaw had

---

[17]The jury charge defined waiver as "an intentional surrender of a known right or intentional conduct inconsistent with claiming the right." Upshaw does not challenge this definition on appeal.

22

breached the franchise agreements—that Lacado actually intended to relinquish its rights under the contract. *See, e.g.*, *In re Gen. Elec. Cap. Corp.*, 203 S.W.3d 314, 316 (Tex. 2006) (per curiam) (orig. proceeding); *Willis v. Donnelly*, 118 S.W.3d 10, 27 (Tex. App.—Houston [14th Dist.] 2003), *rev'd on other grounds*, 199 S.W.3d 262, 277 n.31 (Tex. 2006). We overrule Upshaw's issue 3.

## D. EVIDENCE OF BREACH

To establish a breach of contract, Lacado had to prove (1) the existence of a valid contract, (2) Lacado performed or tendered performance as the contract required, (3) Upshaw breached the contract by failing to perform or tender performance as the contract required, and (4) Lacado sustained damages as a result of the breach. *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 890 (Tex. 2019). Challenging the evidence to support the third element of Lacado's claim, Upshaw argues that there was no evidence he breached the franchise agreements because the agreements did not require him to grant a limited license to a registered trademark, only a common-law mark; to train Lacado employees other than the franchisee; or to pay for advertising. Finally, Upshaw attacks the first element and asserts that because the agreements were "vague and indefinite" regarding training and advertising, they were unenforceable as a matter of law.

For the following reasons, we disagree with Upshaw and overrule issue 1.a.

23

## 1. Failure to Perform

### a. Trademark

Lacado acknowledged in the franchise agreements that Upshaw had "the sole and exclusive right . . . to use the trademarks in connection with the products and services to which they are or may be applied," subject to Lacado's nonexclusive, limited license. Upshaw expressly granted Lacado "a limited license to use the trademarks solely in direct connection with the sale of food, beverage, and other products" at Lacado's franchise locations. Upshaw asserts that there was no breach of this provision because he had a common-law trademark for Taco Casa when he entered into the franchise agreements based on his continuous use of the mark for decades.

At trial, Upshaw testified that he owned no registered trademarks at the time of the agreements with Lacado but that he had owned a common-law trademark "since [he] went into business." But Lacado impeached Upshaw's common-law testimony on cross-examination, and Upshaw's franchise expert witness, Paul Stewart, testified that even if Upshaw had owned a common-law trademark, the Kansas trademark had priority.[18] Stewart also testified that Upshaw's FDD failed to make the requisite disclosures regarding the trademark; therefore, the FDD did not comply with federal law. *See* 16 C.F.R. § 436.5(m)(4). This competing evidence was more than a mere

---

[18]This testimony contradicts Upshaw's appellate argument that his common-law trademark had priority.

scintilla and created a fact issue on ownership of the trademark that was solely the jury's to resolve. In other words, the evidence was legally sufficient to support the jury's implicit finding that Upshaw breached the franchise agreements by failing to own the promised trademark when he signed the franchise agreements.

### b. Training

Upshaw asserts that there was no evidence to establish he breached the training provision because the agreements required Upshaw to train only Wilson and because the agreements put the contractual burden on Lacado to ensure appropriate training.

The franchise agreements provided that Taco Casa would offer a mandatory, one-time training program "to its franchisees." Lacado had to complete the training program "to the satisfaction of" and "in a manner satisfactory to" Taco Casa. "The franchisee" was required to complete 90 training hours before a franchise opened, which also included "supplemental training" at a Taco Casa restaurant. The agreements specified that this training would cover "construction requirements, equipment, site selection, advertising, promotions, accounting and bookkeeping procedures, communications, operations management, personnel management and problem solving." The training would also provide experience in "food preparation, store maintenance and store operations." The second and third agreements added a requirement for the "manager of the store" to complete 200 hours of "store training."

Wilson testified that "[w]e" received "initial training" before the first franchise opened but that none of it addressed construction requirements, equipment, or site

selection. Lacado's district manager, Ginger Rodriguez, similarly testified that Upshaw provided no operational training. In fact, Rodriguez repeatedly asked Upshaw for training, but none was provided. This evidence, which the jury was entitled to credit, is more than a mere scintilla supporting the jury's implicit finding that Upshaw breached the training portion of the franchise agreements.

### c. Advertising

Upshaw argues that no evidence supported a finding that he failed "to develop and administer advertising and sales promotion programs . . . to promote and enhance the collective success of all Taco Casa restaurants," as required in the franchise agreements.

The jury heard evidence that Upshaw performed no media advertising and that Upshaw's marketing director, Art Campbell,[19] had never come up with a corporate advertising program and did not have an advertising budget. Wilson testified that Upshaw "has not done any advertising." And Upshaw admitted that he had disseminated no marketing materials in connection with his obligations as a franchisor. This evidence was legally sufficient to show a breach of the advertising provision even though Upshaw proffered competing evidence that he did some advertising promotions. The jury was entitled to believe that Upshaw's advertising did not promote and enhance the collective success of all franchisees.

---

[19]Campbell was Shelda's brother.

Upshaw argues that the franchise agreements did not require him to pay for the advertising; thus, he did not breach the franchise agreements' advertising provision under that theory of breach. At trial, Wilson asserted that the franchise agreements required Upshaw to pay for advertising but that Upshaw had instead required franchisees to pay for any offered promotions. Based on the language of the franchise agreements, however, Wilson recognized that the advertising provision did not explicitly state that Upshaw would pay. While interesting, Lacado also argued that Upshaw breached the provision by not administering an advertising program as required. As we have discussed above, the jury heard legally sufficient evidence that Upshaw breached this requirement of the advertising provision.

Upshaw points to his contractual good-faith discretion and argues that he was the sole authority on what advertising was sufficient: "The decisions of [Upshaw] made in good faith [regarding the type, quantity, timing, and placement of advertising] shall be final and binding." But the jury could have found that Upshaw's efforts, which the jury heard were limited to individual franchisees and did not enhance collective success, were not in good faith.

## 2. Existence of Valid Contract

Upshaw contends for the first time on appeal that because the parameters of Upshaw's obligations under the franchise agreements regarding advertising and

27

training were vague and indefinite, the agreements were unenforceable.[20]  "An allegation that a provision in a contract is void, unenforceable, or unconscionable is a matter in the nature of avoidance and must be affirmatively pleaded.  If a party fails to plead the affirmative defense, it is waived."  *Godoy v. Wells Fargo Bank, N.A.*, 542 S.W.3d 50, 54 (Tex. App.—Houston [14th Dist.] 2017) (quoting *950 Corbindale, L.P. v. Kotts Cap. Holdings Ltd. P'ship*, 316 S.W.3d 191, 196 (Tex. App.—Houston [14th Dist.] 2010, no pet.)), *aff'd*, 575 S.W.3d 531 (Tex. 2019); *see also* Tex. R. Civ. P. 94. Upshaw did not affirmatively plead that the franchise agreements were indefinite and, therefore, unenforceable.  To the contrary, Upshaw alleged in his breach-of-contract counterclaim that "Upshaw and Lacado, LLC have a valid and enforceable written contract."  And Upshaw testified at trial that he understood he was obligated to provide "certain" training, advertising, and marketing.

### 3.  Interplay Between Breach-of-Contract Recovery and Jury's Fraudulent-Inducement Finding

In issue 7, Upshaw argues that Lacado cannot recover for breach of contract because the jury found that although Lacado had also breached the franchise agreements, it had been fraudulently induced to enter into them by Upshaw's fraud. In other words, Upshaw contends that Lacado cannot recover for breaches of contracts that were found to have been fraudulently induced.

---

[20]Upshaw limits his unenforceability argument to the advertising and training provisions.

Upshaw had alleged in its counterclaim that Lacado had breached the franchise agreements by contesting Upshaw's trademark ownership, which the agreements prohibited:

> [Lacado] acknowledges the sole and exclusive right of [Upshaw] . . . to use the trademarks . . . and represents, warrants and agrees that neither during the term of this agreement nor after the expiration or other termination hereof, shall [Lacado] directly or indirectly contest or aid in contesting the validity, ownership or use of the trademarks by [Taco Casa] . . . .

Lacado pleaded the affirmative defense of fraudulent inducement. The jury found that although Lacado had contested the trademark, contrary to the franchise agreements, Lacado could not be held liable for the breach based on its affirmative defense.

"If a contract or term thereof is unconscionable at the time the contract is made[,] a court may refuse to enforce the contract, or may enforce the remainder of the contract without the unconscionable term, or may so limit the application of the unconscionable term as to avoid any unconscionable result." Restatement (Second) of Conts. § 208 (1981), *quoted in Hoover Slovacek LLP v. Walton*, 206 S.W.3d 557, 565 (Tex. 2006). The trial court did exactly that here. Further, the franchise agreements contained a severability clause, allowing enforceable provisions to be given effect even if other provisions were found to be unenforceable. We overrule issue 7.

## E. EVIDENCE OF DAMAGES

The charge instructed the jury that when determining the amount of Lacado's damages as a result of Upshaw's breaches, the jury was to consider only the amount Lacado paid to Upshaw in performing its obligations under the agreements minus the value Lacado received for those paid amounts. The jury found that Lacado's damages were: (1) $393,261 due to Upshaw's breaches of the first franchise agreement; (2) $269,776 due to Upshaw's breaches of the second franchise agreement; and (3) $264,679 due to Upshaw's breaches of the third franchise agreement.

Upshaw contends in issue 1.b. that the evidence is legally insufficient to support any amount of damages because Lacado grossed $33 million from the three franchises over a seven-year period, resulting in a $3.3 million profit for Lacado, and because Wilson admitted he got some benefit from the franchise agreements; thus, there was no evidence of a causal link from Upshaw's breaches to Lacado's asserted damages. In other words, Upshaw contends that Lacado cannot eat its cake and have it too—Lacado cannot continue to operate and receive benefits under the franchise agreements while also ceasing its own performance obligations, such as paying royalties to Upshaw.

Actual damages are limited to those that are the natural, probable, and foreseeable consequence of the defendant's breach. *Spicer v. Maxus Healthcare Partners, LLC*, 616 S.W.3d 59, 108–09 (Tex. App.—Fort Worth 2020, no pet.) (op. on reh'g). A nonbreaching party is generally entitled to all actual damages necessary to place that

30

party in the same economic position it would have been in had the contract not been breached. *Abraxas Petroleum Corp. v. Hornburg*, 20 S.W.3d 741, 760 (Tex. App.—El Paso 2000, no pet.). A breach-of-contract claim has three possible measures of actual damages: expectancy, reliance, and restitution. *Atrium Med. Ctr., LP v. Hous. Red C LLC*, 595 S.W.3d 188, 193 (Tex. 2020).

The purpose of the reliance measure of damages is to restore the injured party to the economic position it was in before it entered into the contract. *AKIB Constr. Inc. v. Shipwash*, 582 S.W.3d 791, 808–09 (Tex. App.—Houston [1st Dist.] 2019, no pet.); *see also Sterling Chems., Inc. v. Texaco Inc.*, 259 S.W.3d 793, 798 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) ("Reliance damages are measured as the *out-of-pocket* expenditures made by one party in reliance on the actions of another party, not by the amount of lost profits and sales."). The parties agree that Lacado's awarded damages were reliance damages, which would have compensated Lacado for its out-of-pocket expenses. *See id.* Indeed, Lacado's trial counsel argued to the jury that Lacado was seeking a return of the 6% royalties it paid Upshaw for the three franchises because Upshaw had agreed to provide a limited license for the trademark, training, and advertising, all of which were "never provided," in exchange for the royalties. And the jury was charged to consider only the reliance measure of damages.

Again, more than a mere scintilla of probative evidence regarding damages is all that is required for legally sufficient evidence. *See Sw. Energy Prod. Co. v. Berry–Helfand*, 491 S.W.3d 699, 713 (Tex. 2016). Lacado introduced evidence of the total amount of

31

royalties it had paid under the franchise agreements: $1,855,430.78.[21] Lacado also proffered evidence showing that Upshaw did not perform his corresponding contractual obligations to grant a limited license to the mark, to provide complete and supplemental training, or to administer an advertising program that benefited all Taco Casa restaurants. Wilson recognized that Lacado received some benefit from the franchises despite Upshaw's breaches. Of course, Upshaw disputed the extent (or existence) of Lacado's damages, but competing evidence is not legally insufficient evidence. *See, e.g.*, *Cent. Ready*, 228 S.W.3d at 651 (recognizing legal-sufficiency review considers evidence favorable to finding and disregards contrary evidence); *Flanary v. Mills*, 150 S.W.3d 785, 794–95 (Tex. App.—Austin 2004, pet. denied) (concluding evidence of fiduciary relationship was legally sufficient even though competing nonfiduciary-relationship evidence admitted).

Even though the jury's award did not track the damages amount Lacado requested as breach-of-contract damages,[22] a jury has broad discretion to arrive at a

---

[21]Upshaw asserts that because Lacado did not have an expert witness to testify regarding Lacado's damages, the damages evidence is rendered legally insufficient. But Wilson testified to the amounts that Lacado had paid in royalties, and Upshaw does not dispute that these were the correct royalty amounts. Expert testimony was not required. *See, e.g.*, Tex. R. Evid. 701.

[22]Lacado requested the full royalty amount because it asserted it had received no value from the franchise agreements. Upshaw seems to argue that the awarded royalty-based damages failed to "deduct[] any amounts for the benefits [Lacado] received." However, the jury did not award the full amount of Lacado's paid royalties, obviously deducting amounts for the value the jury determined Lacado received as instructed in the charge. As Upshaw asserts in his briefing, the jury heard

32

damages amount based on a rational, calculable basis even if the precise method is "unclear." *Vela v. Wagner & Brown, Ltd.*, 203 S.W.3d 37, 49 (Tex. App.—San Antonio 2006, no pet.) (op. on reh'g); *see Gunn v. McCoy*, 554 S.W.3d 645, 670–71 (Tex. 2018); *Sw. Energy*, 491 S.W.3d at 713; *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 772 (Tex. 2003); *Hertz Equip. Rental Corp. v. Barousse*, 365 S.W.3d 46, 57 (Tex. App.—Houston [1st Dist.] 2011, pet. denied). An award within the range of evidence will be an appropriate exercise of that discretion. *See Sw. Energy*, 491 S.W.3d at 713. The jury's damages award here was within the range of evidence. *See, e.g.*, *Vast Constr., LLC v. CTC Contractors, LLC*, 526 S.W.3d 709, 723–25 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *KMG Kanal–Muller–Gruppe Deutschland GmbH & Co. KG v. Davis*, 175 S.W.3d 379, 396 (Tex. App.—Houston [1st Dist.] 2005, no pet.).

We also disagree with Upshaw's argument that Lacado cannot be awarded reliance damages as a matter of law because Lacado received some value under the franchise agreements. Lacado's argument at trial was that it did not receive what it had bargained for in exchange for the royalty payments; thus, it paid royalty payments for benefits it never received. This is the specific purpose of reliance damages—to compensate Lacado for the expenditures it made in reliance on Upshaw's unmet promises. *See* 24 Williston on Contracts § 64:4 (4th ed. 2021) ("Reliance damages are designed to compensate the plaintiff for any reasonably foreseeable costs incurred or

---

evidence of the value Lacado received from the franchises, which the jury had the discretion to apply to its damages calculation as it saw fit.

33

expenditures made in reliance on the promise that has now been broken."). The fact that Lacado made a profit at the franchises is not fatal to a reliance-damage recovery because reliance damages are divorced from an inquiry into lost profits and sales. *Sterling Chems.*, 259 S.W.3d at 798; *see also* Williston, *supra* § 64:4 ("[I]n some circumstances, as, for example, where the proof of lost profits is not reasonably certain, the promisee may seek, as an alternative to protection of his or her expectation interest, damages based instead on his or her reliance interest.").

We overrule issue 1.b.

## IV. JURY CHARGE

In the charge, the jury was asked in three separate questions, "Did Upshaw fail to comply with the [First, Second, or Third] Franchise Agreement?" Upshaw argues in issue 2 that the trial court erred by submitting "all contractual liability questions in one broad-form jury question" for each franchise agreement because the questions "submitted invalid theories of liability." He contends that because Lacado alleged that Upshaw had breached the franchise agreements in more than one way, a separate question for each way Upshaw breached the agreements was required. We review the trial court's charge under an abuse-of-discretion standard. *See Brumley v. McDuff*, 616 S.W.3d 826, 831 (Tex. 2021) (citing *Tex. Dep't of Hum. Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990) (op. on reh'g)).

Broad-form submission is the rule, not the exception. *See* Tex. R. Civ. P. 277; *see also Island Recreational Dev. Corp. v. Republic of Tex. Sav. Ass'n*, 710 S.W.2d 551, 555

(Tex. 1986) (op. on reh'g) ("Rule 277 means precisely what it says and . . . trial courts are permitted, and even urged, to submit the controlling issues of a case in broad terms so as to simplify the jury's chore."). A trial court is authorized to submit a single theory of liability based on multiple factual allegations in one broad-form question. *See Powell Elec. Sys., Inc. v. Hewlett Packard Co.*, 356 S.W.3d 113, 123–24 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (discussing *Columbia Med. Ctr. of Las Colinas v. Bush ex rel. Bush*, 122 S.W.3d 835, 858–59 (Tex. App.—Fort Worth 2003, pet. denied)). It may not, however, submit multiple theories of liability, some valid and some not, in a broad-form question. *See Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 388 (Tex. 2000) (op. on reh'g). But, in this case, the trial court submitted a single theory of liability—breach of contract—in a broad-form question and, thus, did not abuse its discretion.[23]

Upshaw also asserts that "[l]ikewise, the [trial] [c]ourt did not itemize the damages either." This is the extent of his argument, and he did not further elaborate in his reply brief. Lacado, perhaps understandably, did not respond to this one sentence argument in Upshaw's 77-page opening brief. In any event, Upshaw fails to explain what improper damages theory was submitted in the charge. Indeed, the damages questions explained that the jury should determine only Lacado's reliance

---

[23]As Lacado notes, even if the trial court abused its discretion, it would not be reversible because the evidence was sufficient to support each factual allegation of breach of contract as we have discussed.

damages "and none other": "The amount of money, if any, Lacado paid to Upshaw in performing its obligations under the [First, Second, or Third] Franchise Agreement, less the value Lacado received, if any, in exchange for payment of the money Lacado paid." As we have already discussed, the reliance measure of damages is an appropriate measure of breach-of-contract damages.

We overrule issue 2.

## V. ATTORNEY'S FEES

In the remainder of issue 4, Upshaw argues that Lacado was not entitled to its attorney's fees for three reasons.

### A. PRESENTMENT

He first argues that the award fails because Lacado did not present its claim. *See* Tex. Civ. Prac. & Rem. Code Ann. § 38.002(2). But as Lacado points out, Upshaw did not raise this argument in the trial court and, thus, has failed to preserve it for our review. *See* Tex. R. App. P. 33.1(a); *Albright v. Good Samaritan Soc.–Denton Vill.*, No. 02-16-00090-CV, 2017 WL 1428724, at *5 (Tex. App.—Fort Worth Apr. 20, 2017, no pet.) (mem. op.); *Friend v. Friend*, No. 02-15-00166-CV, 2016 WL 7240596, at *6 (Tex. App.—Fort Worth Dec. 15, 2016, no pet.) (mem. op.).

### B. ALLEGED FAILURE OF AUTHORIZING CLAIM

Second, Upshaw contends that because Lacado cannot recover for breach of contract, Lacado is not entitled to recover its attorney's fees. We have already determined that the evidence was legally sufficient to support the jury's findings

36

regarding Upshaw's breach of the franchise agreements; thus, this argument is without merit.

## C. PROPRIETY OF TRIAL COURT'S DISREGARDING JURY'S ZERO ANSWER AND RENDERING ATTORNEY'S-FEE AWARD

In his third argument, Upshaw asserts that the trial court erred by disregarding the jury's finding that Lacado was entitled to no attorney's fees and rendering an award based on Lacado's fees evidence. At trial, Lacado's trial counsel testified, based on the lodestar standard, that Lacado had incurred $398,446.56 in reasonable attorney's fees from the breach-of-contract suit's inception through trial;[24] would incur $50,000 in reasonable attorney's fees to respond to post-trial motions; and could incur up to $410,000 in conditional appellate attorney's fees. Upshaw's trial attorney cross-examined Lacado's attorney about the requested fees' reasonableness. The jury found that Lacado was entitled to no attorney's fees. However, the trial court disregarded the finding and rendered an attorney's-fee award in favor of Lacado for the full amount its trial counsel had requested—$448,446.56.

Because Lacado prevailed on its breach-of-contract claim, it was authorized to recover its attorney's fees. *See* Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8). When a prevailing party in a breach-of-contract suit seeks attorney's fees, an award of reasonable fees is mandatory if there is proof of the reasonableness of the fees.

---

[24]This amount included only the time Lacado's attorneys spent pursuing the breach-of-contract claim, which was 80% of the total time spent.

*Recognition Commc'ns, Inc. v. Am. Auto. Ass'n*, 154 S.W.3d 878, 891 (Tex. App.—Dallas 2005, pets. denied) (op. on reh'g); *World Help v. Leisure Lifestyles, Inc.*, 977 S.W.2d 662, 683 (Tex. App.—Fort Worth 1998, pet. denied). Accordingly, a jury does not have the discretion to deny an attorney's-fee award if any fees were properly proven. *Recognition Commc'ns*, 154 S.W.3d at 891.

A zero award for attorney's fees is appropriate only if the evidence (1) failed to prove either that an attorney's services were provided or the value of the services provided or (2) affirmatively showed that no attorney's services were needed or that any services provided were of no value. *Id.* Upshaw does not argue that any of these prerequisites to a zero award were met. Indeed, they were not. *See, e.g.*, *Miller v. Debo Homes, LLC*, No. 14-15-00004-CV, 2016 WL 5399507, at *7–9 (Tex. App.—Houston [14th Dist.] Sept. 27, 2016, no pet.) (mem. op.); *French v. Law Offices of Windle Turley, P.C.*, No. 2-08-273-CV, 2010 WL 744794, at *7 (Tex. App.—Fort Worth Mar. 4, 2010, no pet.) (mem. op.). Accordingly, the trial court did not err by disregarding the jury's zero finding regarding Lacado's attorney's fees. *See Midland W. Bldg. L.L.C. v. First Serv. Air Conditioning Contractors, Inc.*, 300 S.W.3d 738, 739 (Tex. 2009) (per curiam); *Smith v. Patrick W.Y. Tam Tr.*, 296 S.W.3d 545, 548 (Tex. 2009); *Recognition Commc'ns*, 154 S.W.3d at 891.

The question then becomes whether the trial court, after appropriately disregarding the jury's zero finding, was empowered to render an attorney's-fee award in the full amount Lacado requested. Upshaw argues that he is entitled to a new trial

on Lacado's attorney's fees because the evidence was factually insufficient to support the awarded amount under the lodestar method. In other words, Upshaw contends that the trial court erred by rendering an attorney's-fee award because the amount was a disputed issue of fact.

The reasonableness of attorney's fees is generally an issue for the trier of fact unless the fees evidence was uncontradicted and, thus, proven as a matter of law. *Smith*, 296 S.W.3d at 546; *Hernandez v. Lautensack*, 201 S.W.3d 771, 778 (Tex. App.—Fort Worth 2006, pet. denied). Here, Lacado sought $1,855,430.78 in breach-of-contract damages, representing the royalties Lacado had paid Upshaw under the franchise agreements with no deduction for value. The jury awarded approximately half of the requested amount—$927,716—apparently concluding that Lacado had received value from the agreements, contrary to Lacado's argument that it had received none. *See Smith*, 296 S.W.3d at 547–48 (recognizing reasonableness of attorney's fees considers the amount of damages awarded and the plaintiff's overall success). Upshaw challenged the reasonableness of Lacado's attorney's fees, raising a fact issue on their amount to be decided by the jury. *See id.* at 548. Accordingly, the trial court "was not free to set a reasonable fee on its own." *Id.*

Upshaw is entitled to a new trial on the amount of Lacado's attorney's fees. We recognize that on retrial, the evidence may support a similar fee award. But, again, that is a matter for the jury to determine as a matter of fact, not a matter for the trial court to determine as a matter of law. *Id.* at 548–49.

39

We sustain this portion of issue 4.

## VI. CONCLUSION

The evidence was legally sufficient to support the jury's breach-of-contract findings and its calculation of damages. Thus, we need not address Upshaw's issues challenging the jury's fraud findings—issues 5.a. through 5.f. and 6. *See* Tex. R. App. P. 47.1. The broad-form questions in the jury charge did not improperly commingle valid and invalid theories of recovery or measures of damages. However, the trial court erred by rendering an attorney's-fee award in Lacado's favor after the jury found it was entitled to none because the issue was one of fact, not law. Accordingly, we affirm in part the trial court's final judgment, reverse that portion of the final judgment awarding Lacado its requested amount of attorney's fees, and remand the attorney's-fees issue to the trial court for a new trial. *See* Tex. R. App. P. 43.2(a), (d). With this disposition, we overrule Upshaw's issue 8 in which he asserts, with no corresponding briefing, that we should reverse and render judgment in his favor.

/s/ Brian Walker

Brian Walker
Justice

Delivered: July 22, 2021

40